TUCKER, Internal Revenue Collector, et al. v. GRIER.

(Circuit Court of Appeals, Eighth Circuit. February 18, 1908.)

No. 2,673.

1. INTERNAL REVENUE—DEALERS IN OLEOMARGARINE—ACTION TO RECOVER TAX PAID.

The provisions of the general internal revenue legislation do not apply to Oleomargarine Act Aug. 2, 1886, c. 840, 24 Stat. 209 (U. S. Comp. St. 1901, p. 2228), except those sections expressly made applicable by section 3 thereof (24 Stat. 209 [U. S. Comp. St. 1901, p. 2229]); and one assessed with a special tax as a dealer under such law, who, before paying the tax at the suggestion of the collector, made application to the Commissioner for an abatement of the same, stating the facts, which application was refused, is not required to again appeal to the Commissioner under Rev. St. § 3226 (U. S. Comp. St. 1901, p. 2088), after he has paid under protest, before he can maintain a suit to recover his payment back as illegally imposed.

2. SAME—WHAT CONSTITUTES DEALER.

Plaintiff was a retail grocer, who, prior to the passage of Act Aug. 2, 1886, c. 840, 24 Stat. 209 (U. S. Comp. St. 1901, p. 2228), had sold oleomargarine. After that he ceased handling it; but having two or three

customers who desired it, at their request and for their accommodation he sent orders in their respective names to the manufacturer for 10-pound packages at a time, to be shipped to each customer in his care. The manufacturer shipped the same to its local branch house, addressed and billed to the customers. The branch house, which did not deliver to retail customers, left the packages at plaintiff's store, and he delivered the same, with other groceries. The customers returned the bills to him, and he remitted for the same to the manufacturer each month, charging the customers with the cash so sent. There was no fraud, nor attempt at concealment, and plaintiff made no profit whatever on the transactions. *Held*, that such transactions were not sales of the article by plaintiff, and did not render him subject to tax as a wholesale dealer.

In Error to the Circuit Court of the United States for the Western District of Arkansas.

James K. Barnes and L. W. Gregg, for plaintiffs in error.
F. A. Youmans, for defendant in error.

Before SANBORN and ADAMS, Circuit Judges, and PHILIPS, District Judge.

PER CURIAM. The writ of error in this case challenges a judgment for the recovery from a collector of internal revenue of $782.20, obtained by him from the defendant in error, against his protest, as a tax on him as a dealer in oleomargarine. A patient consideration of the evidence and of the law, in the light of the arguments presented and authorities cited by counsel, has satisfied us that the judgment below was right, and that we cannot present the facts or the true reasons for the conclusion more clearly or correctly than they have been expressed by Judge Rogers in his findings and opinion in the court below. The judgment is accordingly affirmed upon those findings and upon that opinion, which are approved by this court and which appear in 150 Fed. 658, and read in this way:

"The facts in this case, as found by the court, sitting as a jury, are these: A. & J. Grier is a firm of retail grocery merchants, doing business at Ft. Smith, Ark. Andrew Grier died about three years ago, and more than a year before the matters occurred out of which this suit grew. The business, since Andrew's death, has been conducted by James Grier, as surviving partner, under the original firm name of A. & J. Grier. Before the oleomargarine act of August 2, 1886, was enacted the firm had handled oleomargarine. When that act became a law it declined to handle oleomargarine at all. Once or twice, however, after the oleomargarine act became law, during short seasons in which butter was scarce, it paid the special tax as retail dealers in oleomargarine, and during those short periods did retail oleomargarine. This suit, however, did not grow out of anything which occurred during those periods, but grew out of transactions that occurred long after that time, and at a time when it does not claim to have paid any special tax at all. It never did pay any tax as wholesale dealer at any time. A. & J. Grier (hereafter called the plaintiff) had three customers to whom he sold groceries—i. e., James F. Read, Dr. St. Cloud Cooper, and Mr. F. C. Redmond—who used oleomargarine. The manner in which his grocery business was conducted was this: The orders were either verbal or by telephone, and the goods were sent out by delivery wagons, accompanied by slips showing the quantity and price of the goods. This slip, for the information of the purchaser, was retained by him as a check upon the account of plaintiff, and the goods so sent were charged on the books of plaintiff and paid for monthly. The three customers named used oleomargarine. Two of them, James F. Read and Dr. St. Cloud Cooper, had been using it before the oleomargarine act was passed,

and wished to continue its use. The proof is not clear when Mr. Redmond became a customer of plaintiff, and it is not material, as the transactions were the same as to all three customers. Plaintiff informed those customers that he was not dealing in oleomargarine. Thereupon the said customers requested plaintiff to order it for them in 10-pound packages. Plaintiff was a customer of Armour & Co., packers, of Kansas City, Mo., who had a branch house located and doing business at Ft. Smith, Ark., where plaintiff was in the retail grocery business. When plaintiff would receive a request from either of said three customers to order a package of oleomargarine for them, he would telephone Armour & Co., the branch house at Ft. Smith, to send a 10-pound package of oleomargarine to Judge James F. Read, Dr. St. Cloud Cooper, or F. C. Redmond, as the case might be, care of plaintiff. This order the branch house of Armour & Co. would forward to Armour & Co. at Kansas City, Mo., and that house would forward the package as ordered to its branch house at Ft. Smith, billed to James F. Read, or Dr. St. Cloud Cooper, or F. C. Redmond, as the case might be, in care of plaintiff, and a duplicate of the bill thus made out against the purchaser, which was sent to the branch house at Ft. Smith, was sent (with express charges, if it came by express) by Armour & Co., at Kansas City, Mo., through the mail, to the person to whom it was billed. On the receipt of the package by the branch house of Armour & Co. at Ft. Smith, the manager would send the package, accompanied by the duplicate bill, to the store of plaintiff, who received it and the bill for the person to whom it was billed, and on the next trip of the wagon of plaintiff to deliver other groceries to the purchaser the package of oleomargarine would be put in and delivered at the residence of the purchaser, accompanied by the duplicate copy of the bill of Armour & Co., which had been sent to plaintiff through the branch house of Armour & Co. at Ft. Smith. When the package was delivered at the home of the purchaser by plaintiff in the manner stated, the purchaser would return the bill of Armour & Co. to plaintiff. When plaintiff loaded the package into the wagon, he would charge on his books 'Cash for oleo' (stating the amount contained in the bill), but did not pay Armour & Co. until the beginning of the next month, and when plaintiff made out his bill against the customer who got the oleomargarine he carried the entry on his books 'Cash for oleo,' so much, into the customer's account as of the date it appeared on his books, and it was paid for by the customer in the same way the other groceries were paid for. James F. Read and James Grier testified that plaintiff made the order simply as an accommodation, and paid for the 'oleo' in that way at the request of the customer as a matter of convenience. Plaintiff received no profit on the goods, nor for any service rendered in regard to the 'oleo.' There was no semblance of any evidence that there was any arrangement or subterfuge between any of the parties, and the transaction was open, frank, and candid, and there was no suspicion of fraud or dissimulation attached to it, and the court, being intimately acquainted with both Grier and Read, does not believe that either could be induced to enter into any dishonest business of any character. It is also undisputed that Armour & Co. would not deliver goods to other persons than merchants, and the reason the oleomargarine packages were delivered by Armour & Co. to plaintiff was to avoid putting the customer to the trouble and expense of having to send to the packing house to get the package. The undisputed testimony also shows that the financial responsibility of James F. Read and Dr. St. Cloud Cooper is A-1, and Mr. Grier testifies that Mr. Redmond always paid his bills, but that he did not know much about him; that it was not necessary at all for him to stand good for Dr. Cooper or Mr. Read, but he does not know whether Armour & Co. would have known Mr. Redmond or not; and further, he says that he never made any arrangement to pay Armour & Co. for the oleomargarine, and there never was any understanding about the payment of it, but he always paid it at the request of the parties who purchased it, and in the manner hereinbefore stated. James F. Read testified that, after the trouble grew out of the transaction above referred to, he personally gave his orders to Armour & Co., and the goods were shipped direct to him, and paid for by him by check to Armour & Co. at Kansas City.

"The version of the revenue officers, Cox and Thomas, witnesses for the government, both of whom seemed to be entirely fair-minded and upright,

varies slightly from the facts as stated as to the conversation with James Grier at the time the discovery of these oleomargarine transactions was made by them. This was in June, 1906, about 7 months ago. But, assuming their memory is accurate and their testimony narrating the conversation between themselves and James Grier is exactly as they state it, nevertheless the undisputed facts established by Read and Grier, and the bills of the goods, a part of which were introduced in evidence, make it absolutely certain that the real facts, as I have stated them, is the exact truth. Their version of the conversation between themselves and Grier may be attributable to inaccuracy of memory, or a failure to comprehend precisely what was said, or it may be that Grier made loose statements at that time, the full purport and effect of which he himself did not intend or understand; but neither the one nor the other can affect the established facts as I have stated them, and as they appear from the proof in this case. Nor do these facts, as stated, differ from so much of the report of the revenue officers, made at the time, as was produced at the trial, and is now part of the record, and will be found quoted in the letter of F. W. Tucker, collector, under date of August 14, 1906. It may be noted, in this connection, that the letter of November 5, 1906, addressed by Collector Tucker to plaintiff, which is also in evidence, wherein the collector quotes from a letter from the Commissioner of Internal Revenue, rendering his decision upon the application of plaintiff for an abatement of the assessment and penalty, does not differ at all from the facts as reported by the collector to the Commissioner, and upon which he acted in refusing to abate the tax and penalty. In short, the facts on which the Commissioner of Internal Revenue acted in refusing to abate the tax and penalty were substantially the same as I have stated them above. There is no material difference. Any other facts essential to the determination of this case will be found in the opinion.

"Upon the above state of facts the Commissioner of Internal Revenue decided that plaintiff was a wholesale dealer in oleomargarine, and imposed a tax of $480 upon the plaintiff, plus a penalty of 50 per cent. of the tax, amounting to $240, and a 5 per cent. penalty, amounting to $36, and interest, $14.40, making a total of $770.40. This tax the plaintiff paid under protest, and immediately sued the defendants for the recovery of the money. Before paying the tax, as the result of correspondence between the plaintiff, the internal revenue collector (Tucker) at Little Rock, and the Commissioner of Internal Revenue, forms were presented and an application was made thereon to the Commissioner of Internal Revenue to abate the assessment of the tax, which was subsequently refused. The application and the letter of refusal, and the receipt for the money (which was paid under protest), are a part of the record of this cause; and, after the payment of the tax, no application was made, under section 3220 of the Revised Statutes, to either remit, refund, or pay back either the tax, penalty, or interest, and the only action had towards compliance with that section was the application made to the Commissioner, and his decision thereon, all of which took place before the tax was paid under protest.

"Rogers, District Judge. The first question which arises on this record is whether the plaintiff, before he can maintain his suit, is required to comply with section 3226, Rev. St. (U. S. Comp. St. 1901, p. 2088), which provides as follows: 'No suit shall be maintained in any court for the recovery of any internal tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until appeal shall have been duly made to the Commissioner of Internal Revenue, according to the provisions of law in that regard, and the regulations of the Secretary of the Treasury established in pursuance thereof, and a decision of the Commissioner has been had therein. * * *' If that section applies to the oleomargarine act, and plaintiff has not complied therewith, it ends the case. Kings County Savings Institution v. Blair, 116 U. S. 200, 6 Sup. Ct. 353, 29 L. Ed. 657. The facts in the record show that after plaintiff was assessed, at the suggestion of the collector of internal revenue for the district, he filed his application to the Commissioner of Internal Revenue to have the assessment abated. The facts contained in the record then before

the Commissioner were, in every material respect, exactly the same as are now before the court, and the precise questions now to be decided were determined by him adversely to the plaintiff, and the collector ordered to collect the tax, penalties, and interest, which were paid. The law never requires a thing to be done which is both useless and foolish, and nothing was to be obtained by requiring the plaintiff to do the same thing after the tax was paid which he had done before the tax was paid. If, therefore, it was essential to decide whether the plaintiff was required, after he paid the tax, to make application to the Commissioner of Internal Revenue to have it rebated before instituting his suit, I should hold that section 3226, Rev. St., had been substantially complied with, and would follow the opinion of Sawyer, Circuit Judge, in San Francisco Savings & Loan Society v. Cary, reported in 21 Fed. Cas. 380 (No. 12,317). That case presents the precise question, and Judge Sawyer said: 'But an appeal was taken from the assessment before payment and decided against plaintiff. This I think sufficient. There could be no object in appealing a second time to the same officer in the same case upon precisely the same question. The Commissioner had already decided the identical question, and the object of the law was accomplished in the first appeal.' The precise question here presented was not before the court in 116 U. S. 200, 6 Sup. Ct. 353, 29 L. Ed. 657, and that case is readily differentiated from the one now under consideration, and therefore should not govern it; but I do not consider the question essential in the decision of this case.

"The underlying question is whether sections 3176, 3187, 3220, and 3226, Rev. St. (U. S. Comp. St. 1901, pp. 2068, 2073, 2086, 2088), not being enumerated in Act August 2, 1886, c. 840, § 3, 24 Stat. 209 (U. S. Comp. St. 1901, p. 2229), commonly known as the 'Oleomargarine Law,' and not being enumerated in Act May 9, 1902, c. 784, 32 Stat. 193 (amending the oleomargarine law), commonly known as the 'Adulterated Butter Act,' have any application at all to the collection of taxes on oleomargarine. If they do not, then the compliance by the plaintiff with sections 3220 and 3226, Rev. St. U. S., was not required, and the action of the Commissioner of Internal Revenue in assessing a penalty of 50 per cent. under section 3176, Rev. St., and a 5 per cent. penalty and interest under sections 3186 and 3187, Rev. St., upon plaintiff, was without authority of law, and the collection thereof illegal and unwarranted. The sections of the internal revenue law which are enumerated by the third section of the oleomargarine act, supra, are sections 3233 to section 3241, inclusive and section 3243, Rev. St. U. S. (U. S. Comp. St. 1901, p. 2190). None of these sections authorize the penalty or interest in cases of a refusal or neglect in making a list or return, or in paying the tax provided for under that act, or the issuance of any distraint warrant for their collection under any circumstances. Nor is there any such provision made in Act May 9, 1902, supra.

"The contention is that the whole internal revenue legislation in existence at the time of the passage of the oleomargarine act, so far as applicable, applied to the oleomargarine law. If that were true, the question naturally arises: Why did Congress, by the third section of the oleomargarine law, select from the body of the internal revenue law 11 sections—i. e., 3232 to 3241, inclusive, and section 3243, Rev. St.—and by express provision extend them, as far as applicable, to the oleomargarine law? It is not perceived how the fourth paragraph of the third section of the oleomargarine law could be otherwise than utterly superfluous, if Congress intended that the whole internal revenue law, including those sections, should instantly become applicable as soon as the oleomargarine law went into effect. Moreover, on October 1, 1890, Congress amended the oleomargarine law (Act Oct. 1, 1890, c. 1244, 26 Stat. 621 [U. S. Comp. St. 1901, p. 2235]) as follows: 'That wholesale dealers in oleomargarine shall keep such books and render such returns in relation thereto as the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, may by regulation require, and such books shall be open at all times to the inspection of any internal revenue officer or agent.' What explanation can be made of the object of Congress in enacting that amendment, if sections 3303, 3304, 3318, 3337, 3338, 3357, 3358, and 3375, Rev. St. (U. S. Comp. St. 1901, pp. 2155, 2156, 2164, 2185, 2186, 2198, 2207), and other sections of the internal revenue law, were already applicable to the

·oleomargarine law? Surely the ingenuity of the internal revenue officers would not be taxed to find ample authority in those sections to accomplish ·all that is provided for in Act Oct. 1, 1890, supra. That amendment, also, was utterly superfluous if the internal revenue law applies to the oleomargarine law. What object could Congress have had in enacting section 19 of the oleomargarine law (Act Aug. 2, 1886, c. 840, 24 Stat. 212 [U. S. Comp. St. 1901, p. 2234]) if section 3213, Rev. St. (U. S. Comp. St. 1901, p. 2083), which is part of the general internal revenue law, applied to the oleomargarine law? Both sections would accomplish the same purpose. What object was there in enacting section 17 of the oleomargarine law (24 Stat. 212, c. 840) if section 3257, Rev. St. (U. S. Comp. St. 1901, p. 2112), a part of the internal revenue law, is applicable to the oleomargarine law? They both accomplish the same purpose. What purpose had Congress in enacting section 13 of the oleomargarine law (24 Stat. 211, c. 840 [U. S. Comp. St. 1901, p. 2232]), if section 3324, Rev. St. (U. S. Comp. St. 1901, p. 2168), a part of the internal revenue law, applied to the oleomargarine law? Both sections were intended to accomplish a like purpose. The same is true of section 9 of the oleomargarine law (24 Stat. 211, c. 840 [U. S. Comp. St. 1901, p. 2231]), and section 3296, Rev. St. (U. S. Comp. St. 1901, p. 2136), a 'part of the internal revenue law. If you turn to the act approved May 9, 1902 (32 Stat. 194, c. 784, § 3 [U. S. Comp. St. Supp. 1907, p. 637]), which is an act amending the oleomargarine law, it will be found that that act extends the provisions of the internal revenue law concerning coupon stamps on tobacco and snuff to the oleomargarine law as far as applicable. Why enact this provision, if all the body of the internal revenue law applies to the oleomargarine law? Why enact Act May 9, 1902, c. 784, § 6, 32 Stat. 197 (U. S. Comp. St. Supp. 1907, p. 641), and make it apply equally to oleomargarine and adulterated butter, if the internal revenue law already applied to both and made ample provision for everything that was contained in that section? It will be remembered that every argument that can be made fixing the applicability of the internal revenue law to the oleomargarine law can with equal force and propriety be made to the adulterated butter law of May 9, 1902, supra. It is not perceived that any one who is fair-minded can carefully examine and compare the oleomargarine act and its amendment with the existing general internal revenue legislation without being convinced that Congress intended that the oleomargarine statute and the amendments thereto, including the sections of the internal revenue law expressly extended to the oleomargarine law and its amendments, was neither supplementary of or an amendment of the existing general internal revenue legislation, but were a separate and independent act, creating a complete and comprehensive system in itself, and containing provisions for all the punishments, penalties, fines, forfeitures, and interest which the Congress intended the citizen should pay, and also complete remedies and methods, for their collection.

"This precise question has been before other courts, and was fully discussed, and without exception this same conclusion has been reached. Schafer v. Craft (D. C.) 144 Fed. 907, is precisely in point, and the writer is entirely satisfied with the reasoning and conclusions of District Judge Evans in that case. In re Kinney (D. C.) 102 Fed. 468, bears directly on the subject, and District Judge Brown's reasoning on the point is to my mind conclusive. It follows that, if the conclusions reached are correct, the plaintiff not only was not required by law to make any claim under section 3226, Rev. St., before instituting his suit to recover the tax, penalty, and interest, but the action of the revenue officers in imposing the two penalties, one of 50 per cent. of the tax, amounting to $240, and the other of 5 per cent., amounting to $36, and interest, amounting to $14.40, was unauthorized in law, illegal, and plaintiff is entitled to recover said sums paid under protest, with interest at 6 per cent. from the date of payment thereof.

"The question now remains: Was plaintiff a dealer in oleomargarine? The statute provides (Act Aug. 2, 1886, c. 840, 24 Stat. 209 [U. S. Comp. St. 1901, p. 2229]), that: 'Every person who sells or offers for sale oleomargarine in the original manufacturer's packages shall be deemed a wholesale dealer in oleomargarine.' Did plaintiff sell, or offer for sale, oleomargarine? On the state of facts set forth the court thinks not. Plaintiff gave the order to Armour

& Co. for the 10-pound packages of oleomargarine for his customers, and requested it shipped to his own care. The bills were made out by Armour & Co. to his customers, and it was shipped to them through its local branch house to the care of plaintiff, as directed. Armour & Co. was not even directed at the time to deliver the goods at the house of plaintiff. Armour & Co. must be held to have known to whom the goods were sold. Its branch house must be held to have known it, and to have known why it was shipped to the care of plaintiff and delivered at plaintiff's store; and the knowledge of the branch house was the knowledge of the Kansas City house of Armour & Co. Hoover v. Wise, 91 U. S. 308, 23 L. Ed. 392. Armour & Co. knew plaintiff was not buying the oleomargarine from them, and in all reason they knew he was not handling it. Shipping goods to one man to the care of another does not constitute a sale to the man to whose care they were shipped. But it is said plaintiff actually paid Armour & Co. for the goods, and entered the charge on his own books against his customers. So he did; but before he did that the 'sale' by Armour & Co. to his customers was as complete in law as it could be. The sale was complete if it never had been paid for by the customers (nor any one else, as for that), and just as complete as if it had been paid for before plaintiff made any entry upon his books. It was not the paying for the goods, or the entering upon plaintiff's books, that completed the sale. It was the segregation of the goods from the mass of Armour & Co.'s stock and the delivery to his customer, and the delivery was complete when the goods were first received by plaintiff, who was the agent of his customers for that purpose. Suppose the customer never had paid Armour & Co. for the oleomargarine in question; would that, of itself, have made plaintiff legally liable for it, in the absence of any promise, express or implied, to pay for it? Plaintiff might have felt morally liable to see that it was paid for; but did that make him legally liable therefor? Plaintiff says he never made any promise to Armour & Co. to pay for it, but that he did pay for it because his customers requested him to do so, and charged the purchase price in their accounts with him. He did this; but did that make him the purchaser? When plaintiff received the goods, it was in law a delivery to the customer. They had ordered the goods through plaintiff, delivered in that way, and therefore a delivery to plaintiff was a delivery to them. Plaintiff was simply the agent of his customers to receive the goods. Suppose, at the moment the goods were delivered to plaintiff, his house had burned, and the goods had been lost; whose loss would it have been? Plaintiff's? By no means. Why not? Because the goods were not his. He received them as agent for his customers. He afterwards paid for them in the same way, but not until the goods were delivered to him as his customers' agent, and the sale was absolute and complete. Did subsequently charging the amount of money he paid for his customers to Armour & Co for the goods at their request alter the transaction? Not at all. Before that was done the sale was complete by delivery, and nothing was left to be done to complete it. The payment for the goods and the entry on his books and the delivery of the goods to the customer were all subsequent to the delivery by Armour & Co., and the manner and method of doing these things were simply matters of accommodation to plaintiff's customers. In truth, the real facts show plaintiff was not advancing the money to pay for the goods. He charged the cash to the customer as of the date the oleomargarine was sent out from his store; but he did not pay Armour & Co. until the 1st of the month, and at that time his customer paid him, so that in fact he advanced no money. The charge on plaintiff's books was simply to keep the matters between him and his customers correct, and that only. The proof, as before stated, shows that plaintiff made no promise to pay for the goods, although he did pay for them in the way stated. Nor did he guarantee payment. Suppose he had; did that make him a purchaser? By no means. If he did not purchase them, he did not own them; if he did not own them, he had no interest in them to sell; if he did not sell or offer to sell, he was not a dealer.

"Hartzell v. U. S. (D. C.) 83 Fed. 1003, is in point, in which case District Judge Allen quotes from Benjamin on Sales as follows: 'But then, in some cases, a broker, though acting as agent for a principal, makes a contract of sale and purchase in his own name. In such case he may be sued by the party

with whom he has made such contract for a nonfulfillment of it. But so, also, may his undisclosed principal; and, although the agent may be liable upon the contract, yet I apprehend nothing passes to him by the contract. The goods do not become his. He could not hold them, even if they were delivered to him, as against his principal. He could not, as it seems to me, in the absence of anything to give him a special property in them, maintain any action in which it was necessary to assert that he was the owner of the goods. The goods would be the property of his principal, and although two persons, it is said, may be liable on the same contract, yet it is impossible that two persons can each be the sole owner of the same goods. Although the agent may be held liable, as a contractor, on the contract, he still is only an agent, and has acted only as agent. He could not be sued, as it seems to me, merely because he had made the contract of purchase and sale in his own name with the vendor, even though the contract should be in a form which passes property in goods by the contract itself by a third person, as if he (the broker) were the owner of the goods, as if, for instance, the goods were a nuisance or an obstruction, or, as it were, trespassing, he would successfully answer such an action by alleging that he was not the owner of the goods, and by proving that they were the goods of his principal, till then undisclosed. If he could not be sued for any other tort merely on the ground that he had made the contract in his own name with the vendor, it seems to me that he cannot be successfully sued merely on that ground by the real owner of the goods as for a wrongful conversion of the goods to his own use.'

"It thus appears that if plaintiff had been a broker and primarily liable, or equally liable with the purchaser, the result would be the same. But he was not a broker. He got no commission or compensation for anything he did. He made no promise, express or implied, to Armour & Co. to do or to be responsible for anything. His obligations were to his customers to receive and deliver the goods for them, and with that Armour & Co. had nothing whatever to do. He was under no obligation to Armour & Co. to even receive the goods from them, although by his request they were shipped to his care. He might, when they came, have said to Armour & Co.: 'I will notify my customers, and they will send for the goods.' To do so would not have been any breach of good faith, or good morals, much less of any principle of law. Armour & Co. in fact, under the evidence, had no claim upon plaintiff at any time in regard to the goods. That plaintiff received them and paid for them was a mere matter of accommodation for his customers. It is said that the fact that the orders were small, and that plaintiff received nothing for his trouble, does not alter the transaction. It does not, in one sense; but it does very materially bear upon it in another. It is conceded that a man may buy goods and sell them below cost, in large or small quantities. But the purchase and sale is no less a purchase and sale on that account. But in this case the size of the transaction and the fact that no profit was made, when considered in connection with the relations of plaintiff and his customers, and the characters of both, tend to make clear the bona fides of the transaction. As to both plaintiff and his customers it is proper to say that there is nothing in the transactions themselves which is not absolutely consistent with good faith and fair dealing, whatever suspicions the methods employed may suggest. As a matter of fact the whole transaction was fair, free from any bad motive, and resulted in no wrong to the United States.

"The exaction and collection of the tax was unauthorized and illegal, and the plaintiff is entitled to recover of defendants the same in full, with interest."